UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MARIE BENTRUP,                      )
                                    )
                Plaintiff,          )
                                    )
        v.                          )       No.  4:04CV1502 FRB
                                    )
JO ANNE B. BARNHART,                )
Commissioner of Social Security,    )
                                    )
                Defendant.          )

**MEMORANDUM AND ORDER**

This cause is on appeal for review of an adverse
determination by the Social Security Administration.  All matters
are pending before the undersigned United States Magistrate Judge,
with consent of the parties, pursuant to 28 U.S.C. § 636(c).

**I. Procedural History**

On February 12, 2002, plaintiff Marie Bentrup filed an
application for Disability Insurance Benefits pursuant to Title II
of the Social Security Act, 42 U.S.C. §§ 401, et seq., in which she
claimed she became disabled on December 15, 1986.  (Tr. 75-77.)  On
initial consideration, the Social Security Administration denied
plaintiff's claim for benefits.  (Tr. 29, 45-48.)  A hearing was
held before an Administrative Law Judge (ALJ) on March 25, 2004.
Plaintiff testified and was represented by counsel.  (Tr. 20-28.)
On July 9, 2004, the ALJ issued a decision denying plaintiff's
claim for benefits.  (Tr. 9-19.)  On September 24, 2004, the

- 1 -

Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 4-7.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

At the hearing on March 25, 2004, plaintiff testified in response to questions posed by the ALJ and counsel.

Plaintiff testified that she has suffered from panic attacks and depression for many years, dating back to the 1980's, and that she received an affirmative diagnosis of the condition in 1986. Plaintiff testified that she attempted to work with her condition but had to quit her employment because of her inability to deal with the stress. Plaintiff testified that her last employment was at Sam's Club from May 2002 to December 2003, and that she had two medical leaves of absence during her last year of employment there. (Tr. 23-24.) Plaintiff testified that she believed it was helpful for her to work and that her doctor instructed her to work part-time, but that her employer wanted her to work full-time. (Tr. 24.)

Plaintiff testified that she had a few panic attacks while at work and that Sam's tried to work with her and let her off of work for medical leaves of absence but that they nevertheless insisted that she work full-time, which she could not do because of the stress associated with full-time work. (Tr. 24-25.) Plaintiff testified that in addition to her medical leaves of absence, she

was late and missed work on many occasions but was never written up because she was a good worker when she was there. Plaintiff testified, however, that she was warned that she would be written up or would have to be coached. (Tr. 26.)

### III. Period of Disability

Plaintiff applied for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. DIB provides benefits to disabled persons who have paid into the social security system and operates as a "type of insurance" against disability. 42 U.S.C. § 423(a)(1); Belcher v. Apfel, 56 F. Supp. 2d 662, 667 (S.D.W.V. 1999). "Just as an insurance policy would lapse after the policy owner ceases to pay the premiums, the same is true for disability insurance." Belcher, 56 F. Supp. 2d at 667 (citing 20 C.F.R. § 404.101). As such, a person loses her eligibility for DIB within a prescribed period of time after she stops paying into the social security system. Id. To receive benefits after losing her disability insured status, a claimant must demonstrate that she became disabled prior to the expiration of her disability insured status, and that such disability existed continuously to at least within twelve months of the date she applied for disability benefits. Flaten v. Secretary of Health & Human Servs., 44 F.3d 1453, 1458-59 (9th Cir. 1995); Arnone v. Bowen, 882 F.2d 34, 38 (2d Cir. 1989); Belcher, 56 F. Supp. 2d at 667. In this cause, the parties do not dispute that plaintiff's disability insured status

expired on March 31, 1993, and plaintiff filed for DIB on February 12, 2002. As such, to be determined eligible for the receipt of DIB benefits, plaintiff must demonstrate that she became disabled on or prior to March 31, 1993, and that such disability existed continuously to at least February 12, 2001.

## IV.   Medical Records

Plaintiff was admitted to St. Louis University Medical Center (SLU Medical Center) from November 20 through December 29, 1986, with an admitting diagnosis of obsessive, compulsive disorder (OCD). (Tr. 336-38.) Plaintiff was thirty years of age and reported compulsive hand washing and phobic avoidance of dirt and germs. (Tr. 335.) Plaintiff also reported experiencing excessive perspiration, headaches, gastric upset, and dizziness during her anxiety episodes. (Tr. 323-24.) Plaintiff reported that she saw a psychiatrist, Dr. Meyer, in October 1986 regarding the condition, but that the medication he prescribed caused an adverse reaction and made plaintiff nervous. (Tr. 163-64.)

During plaintiff's admission at SLU Medical Center, plaintiff made excellent progress in all targeted areas and Dr. Shael Bronson noted plaintiff to be very effective in managing anxiety. (Tr. 335.) Plaintiff underwent counseling and behavioral therapy during her stay at SLU. (Tr. 168-83.) Upon discharge on December 29, 1986, Dr. Bronson noted plaintiff to be able to expose herself to numerous "contaminants" formerly avoided. Dr. Bronson

noted plaintiff to have high motivation and to be very satisfied with the improvement in her condition. Unnecessary hand washing was easily eliminated and nearly completely so at the time of discharge. Home visits showed that plaintiff was able to resume responsibilities at home without compulsive hand washing. Dr. Bronson noted that plaintiff would be followed up in outpatient care with Dr. T. Flynn. No physical or dietary restrictions were placed upon plaintiff upon discharge, and plaintiff was prescribed no medication. (Tr. 335.)

Plaintiff was admitted to SLU Medical Center on January 11, 1988, for her condition of OCD. It was noted upon admission that plaintiff was currently obsessed with keeping herself and the house clean so that her daughter would not be harmed. (Tr. 154.) It was noted that plaintiff had been treated regularly in the Outpatient Clinic but that she reported her anxiety to have been mounting during the previous two months. (Tr. 155.) Upon discharge on March 17, 1988, Dr. Bronson noted plaintiff to again be able to grocery shop, cook, go into the basement, and allow her daughter to play on the floors. It was noted that plaintiff planned to seek employment and to consider daycare for her daughter. Dr. Bronson noted that plaintiff and her husband would be seen for follow up care by Dr. Pollard. Upon discharge, plaintiff was prescribed Xanax[1] and Desyrel.[2] Plaintiff's diet and

---

[1]Xanax is indicated for the management of anxiety disorder or the short-term relief of symptoms of anxiety. Physicians' Desk

activities were noted to be unrestricted.  (Tr. 154.)

On September 26, 1991, plaintiff visited SLU Medical Center for evaluation for possible systemic lupus.  (Tr. 312-13, 320-22.)  Plaintiff's history of depression and OCD was noted.  It was noted that plaintiff had taken Prozac[3] but was taken off the medication for a period of time because of swelling in her hands and a feeling of vibration in her head.  Plaintiff reported that she gets red blotches on her neck when she becomes nervous.  Plaintiff also complained of knee and foot problems and intermittent hip pain.  Plaintiff's current medications were noted to include Prozac and Ceclor.  Review of plaintiff's medical history showed plaintiff's five-week psychiatric admission in 1986 and ten-week psychiatric admission in 1988 for OCD.  (Tr. 312.)  Physical examination showed plaintiff to be in no acute distress and oriented in three spheres.  Swelling about the hands was noted as well as stiffness about the knees and hips.  It was questioned whether plaintiff suffered systemic lupus erythematosus (SLE).  It was also questioned whether plaintiff's positive ANA (antinuclear

---

Reference 2650 (55th ed. 2001).

[2]Desyrel is used to relieve mental depression and depression that sometimes occurs with anxiety.  Medline Plus (revised Jan. 10, 2005)<http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202573.html>.

[3]Prozac is indicated for the treatment of depression and for the treatment of obsessions and compulsions in patients with obsessive-compulsive disorder.  Physicians' Desk Reference 1127-28 (55th ed. 2001).

antibodies) was due to Prozac. (Tr. 313.)

On October 29, 1991, it was noted by the SLU Medical Center that plaintiff's chemical panel was within normal limits. (Tr. 319.) Dr. Terry Moore determined Prozac not to be causing any drug-induced syndrome. (Tr. 321-22.) Plaintiff reported that she was gaining weight on Prozac. Plaintiff had only minimal joint complaints and reported no skin rashes, vasculitis, or joint swelling or tenderness. No evidence of connective tissue disease was noted. No treatment plan was indicated, and plaintiff was instructed to return as needed. (Tr. 319.)

On April 13, 1993, Dr. Bronson prescribed Prozac for plaintiff. (Tr. 146.)

Plaintiff saw Dr. Bronson on April 14, 1993, for an office visit. (Tr. 152.) On that same date, Dr. Bronson reported in a memorandum that plaintiff had been under his care for OCD since 1990 and that high doses of Prozac had been the only effective medication for plaintiff following two hospitalizations and multiple other drugs, including tricyclics Zoloft[4] and Anafranil.[5] (Tr. 146.) From the record, it appears that such memorandum was created in an effort for plaintiff to obtain certain

---

[4]Zoloft is indicated for the treatment of depression. Physicians' Desk Reference 2553-54 (55th ed. 2001).

[5]Anafranil is used to relieve mental depression and to treat obsessive-compulsive disorders. Medline Plus (revised Feb. 1, 2005)<http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202055.html>.

prescription benefits under her insurance plan. (Tr. 148-49.)

On December 16, 1994, plaintiff saw Dr. Bronson for an office visit. (Tr. 151.)

On June 10, 1996, plaintiff reported to Graphic Arts Managed Care that she had previously been diagnosed with OCD and depression and that she was returning to her repetitive actions. Plaintiff reported that taking Prozac "used to work," as well as other medications, but that the medication currently did not work. Plaintiff reported that she stopped taking Prozac and Luvox[6] in February 1996 because of side effects. Plaintiff was diagnosed with OCD and major depression-recurrent. It was noted that plaintiff's stressors included not taking her medications, conflicts with her family regarding her symptoms, and inability to follow through. Plaintiff was referred to Dr. Soorya for evaluation and medication. (Tr. 287.)

In a telephone consultation with Graphic Arts on August 9, 1996, plaintiff reported that she experienced intermittent suicidal thoughts, depressed mood, decreased energy, irritability with angry outbursts, decreased appetite, insomnia, confusion, decreased concentration, crying spells, anhedonia, and feeling overwhelmed. (Tr. 288.) Plaintiff reported her previous diagnosis of OCD and requested brief hospitalization for stabilization

_____

[6]Luvox is indicated for the treatment of obsessions and compulsions in patients with obsessive-compulsive disorder. Physicians' Desk Reference 3153 (55th ed. 2001).

purposes. A three-day hospitalization was authorized. (Tr. 288.)

Plaintiff was admitted to St. Anthony's Medical Center on August 10, 1996, and reported that she had been manifesting depression with OCD as well as anxiety since 1986 when she was first hospitalized. (Tr. 196.) Plaintiff reported to Dr. Fred Gaskin that she had taken numerous medications with various side effects. (Tr. 196, 198.) Plaintiff reported that she took Prozac on and off since 1988 and that the medication seemed to help her condition. (Tr. 196, 198.) Plaintiff reported, however, that in February 1996, the Prozac caused her to become more anxious and suicidal and that she had not taken any antidepressants since that time. (Tr. 196.) Plaintiff underwent treatment at St. Anthony's and was discharged on August 13, 1996, with no thoughts of suicide. Plaintiff's depression was noted to have improved. Plaintiff was diagnosed with OCD with panic attacks. (Tr. 197.)

In her discharge psychosocial assessment conducted on August 13, 1996, plaintiff reported that she had taken medication since 1988 and that the Prozac was working with respect to her OCD behavior, but that the medication started to make her more anxious, at which time she stopped taking it in February 1996. (Tr. 200.)

From August 1996 through April 1997, plaintiff continually visited Dr. Gaskin who prescribed and adjusted various psychotropic medications for plaintiff's anxiety, depression and OCD, with variant success. (Tr. 275-86.) After a series of adjustments to her medication, plaintiff reported to Dr. Gaskin in

December 1996 that Prozac worked really well in the past but that it did not work the previous February and that she became nervous. (Tr. 278.)

On April 24, 1997, plaintiff was admitted to Missouri Baptist Medical Center for consultation to determine whether plaintiff was a candidate for MAO inhibitors as well as for a possible surgical procedure for OCD patients. In her psychiatric history, plaintiff reported that she first became aware of her OCD symptoms while she was pregnant in 1984. It was noted that plaintiff had been treated with numerous antidepressants since that time and that plaintiff was admitted to SLU Medical Center in 1986 and 1988 for her condition, and was admitted to the Hyland Center in August 1996 as well. (Tr. 270-71.) Plaintiff was diagnosed with OCD, severe due to depression. (Tr. 271.)

On May 7, 1997, plaintiff reported to Dr. R. Eugene Holemon that she had taken Prozac off and on since 1988 and that such medication helped her depression and anxiety, but not her OCD. Plaintiff also reported that she was admitted to the Behavioral Health Unit at SLU Medical Center in 1988, but that such treatment did not help her as much as the Prozac. (Tr. 257.)

From May 1997 through January 1999, plaintiff continually visited Dr. Holemon who prescribed and adjusted various psychotropic medications for plaintiff's anxiety, depression and OCD, with variant success. (Tr. 256-65.) In October 1997, plaintiff reported to Dr. Holemon that her admissions to the

Behavioral Health Unit at SLU Medical Center in 1986 and 1988 provided no help. (Tr. 260.)

From February 1999 through February 2002, plaintiff continually visited Dr. Jeffrey S. Pevnick who prescribed and adjusted various psychotropic medications for plaintiff's anxiety, depression and OCD, with variant success. (Tr. 223-55.)

On July 26, 2001, plaintiff was admitted to the emergency room at Missouri Baptist Medical Center for increased symptoms of depression. Plaintiff complained that she could not eat, was in bed for days, felt sick to her stomach, and had suicidal thoughts. Plaintiff's history of depression was noted. (Tr. 212-13, 215-21.) Plaintiff reported that her depressive condition increased three months prior. (Tr. 219.) Plaintiff was discharged that same date with instructions to follow up with Dr. Pevnick. (Tr. 215, 221.)

In a letter dated April 9, 2002, Dr. C. Alec Pollard reported to Disability Determinations that he recalled treating plaintiff for OCD at SLU Medical Center on dates unknown to him. Dr. Pollard reported that he recalled the level of distress and disability associated with plaintiff's OCD to be quite severe at the time, but that she had made some progress. (Tr. 184.)

As set out above, a review of the record shows that since June 1996, plaintiff continually and regularly sought and received treatment for her increasing symptoms of OCD, with the success of such treatment fluctuating between relief and exacerbations. (Tr. 187-88, 193-311.) Plaintiff's psychotropic medications were

continually adjusted during this period with intermittent benefit reported. (Id.) The treatment sought and obtained by plaintiff during this period related only to her symptoms and complaints experienced by plaintiff at the time of such treatment. To the extent historical information relating to the time period on or around March 31, 1993, was provided in such treatment notes, it has been set out in detail above.

## V. The ALJ's Decision

The ALJ found that plaintiff met the disability insured status requirements of the Social Security Act on December 15, 1986, the date of the alleged onset of disability, and continued to meet them through March 31, 1993, but not thereafter. The ALJ found that plaintiff had not engaged in substantial gainful activity from December 15, 1986, through at least February 2002. The ALJ found the medical evidence to show that from December 15, 1986, through March 31, 1993, plaintiff had OCD which responded well to treatment. The ALJ found plaintiff's allegations of disabling symptoms from December 15, 1986, through March 31, 1993, not to be consistent with the evidence as a whole and thus not persuasive or credible. The ALJ determined that prior to April 1, 1993, plaintiff did not have a severe impairment, either singly or in combination. The ALJ determined plaintiff not to have sustained her burden of proving that she had a severe impairment or severe combination of impairments by the time her insured status expired

on March 31, 1993, and thus that plaintiff was not under a disability at any time through March 31, 1993.

## VI.  Discussion

To be eligible for Social Security Disability Insurance Benefits under the Social Security Act, plaintiff must prove that she is disabled and that such disability commenced prior to the expiration of her disability insured status.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992); <u>Flaten v. Secretary of Health & Human Servs.</u>, 44 F.3d 1453, 1458-59 (9th Cir. 1995); <u>Arnone v. Bowen</u>, 882 F.2d 34, 38 (2d Cir. 1989).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  <u>See</u> 20

- 13 -

C.F.R. § 404.1520; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities.  If the claimant's impairment is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment is equivalent to one of the listed impairments, she is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence.  42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is

- 14 -

supported by substantial evidence, the Court must review the entire

administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts

from the Commissioner's decision. Warburton v. Apfel, 188 F.3d

1047, 1050 (8th Cir. 1999). However, even though two inconsistent

conclusions may be drawn from the evidence, the Commissioner's

findings may still be supported by substantial evidence. Pearsall,

274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th

Cir. 2000)). A Commissioner's decision may not be reversed merely

because substantial evidence also exists that would support a

contrary outcome. Jones ex rel. Morris v. Barnhart, 315 F.3d 974,

977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole and specifically, that the ALJ erred in terminating his analysis at Step Two of the evaluation process by finding plaintiff's impairment not to be severe. Plaintiff claims that a proper review of the hospitalization records, treatment notes and third party observations shows that plaintiff met the de minimus standard of establishing a severe impairment. For the following reasons, plaintiff's argument fails.

To be disabled and thus entitled to Social Security disability benefits, plaintiff must have a severe impairment. Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (citing 20 C.F.R. § 404.1520(a) (1996)). "To qualify as severe, an impairment must 'significantly limit [a claimant's] physical or mental ability to do basic work activities,' . . . which are 'the abilities and aptitudes necessary to do most jobs.'" Id. (quoting 20 C.F.R. § 404.1521(a), (b) (1996)).

> The ability to do most work activities encompasses the abilities and aptitudes necessary to do most jobs. . . . Examples include physical functions such as walking, sitting, standing, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work situation.

Nguyen v. Chater, 75 F.3d 429, 431 n.1 (8th Cir. 1996) (quotation marks and citations omitted).

Where an impairment has no more than a minimal effect on a claimant's ability to do work, the ALJ may find the claimant's impairment not to be severe, and thus end his analysis at the second step of the sequential evaluation process. Nguyen, 75 F.3d at 431. "Denial of benefits at step two is justified only for those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." Id. (internal quotation marks and citations omitted).

As discussed supra at Section III, the plaintiff here must demonstrate that she was under a disability at the time her insured status expired, that is, March 31, 1993. In his decision, the ALJ accurately noted there to be "relatively little medical evidence documenting the claimant's condition during the critical period from her alleged onset date of December 15, 1986 through her date last insured of March 31, 1993." (Tr. 14.) The ALJ specifically noted that plaintiff's hospitalization in November 1986 provided very good results. The ALJ noted that with such hospitalization and accompanying therapy, plaintiff was found by Dr. Bronson to be very effective in managing anxiety and to have improved with respect to her OCD behaviors. Indeed, as the ALJ found, the record shows such behaviors to have virtually disappeared by the time of plaintiff's discharge in December 1986, with no restrictions placed upon plaintiff and no medications

prescribed at discharge. (Tr. 15, 16.) The ALJ further noted plaintiff's hospitalization in 1988 to be in response to symptoms of OCD which had increased during the previous two months. The ALJ noted the positive results of this hospitalization with plaintiff determining to look for a job upon discharge. The ALJ noted again that no restrictions were placed upon plaintiff at the time of discharge. (Tr. 15.) The ALJ further noted that plaintiff's next documented treatment for any condition was for evaluation of possible systemic lupus in 1991, the results of which were negative for the condition. (Tr. 16.) Finally, the ALJ noted the next documentation of any medical treatment was in Dr. Bronson's April 1993 memorandum wherein he stated that he had been treating plaintiff since 1990 for OCD and that high dose Prozac was the only effective medication for plaintiff's condition. (Tr. 16.)

Upon review of the record as a whole, the ALJ found that plaintiff's condition had stabilized with her hospitalizations in 1986 and 1988 and that on or about March 31, 1993, the condition was controlled with medication. To support this finding, the ALJ noted that plaintiff did not thereafter seek medical assistance for symptoms of her mental condition until June 1996, which was four months after she had stopped taking Prozac due to side effects. "This indicates that the Prozac worked on her [OCD] and it was only well after her date last insured that she quit taking it because of side effects." (Tr. 16.) The ALJ also noted there to be no persuasive evidence in the record demonstrating that plaintiff

suffered severe side effects from her medication on or before the
date she was last insured. (Id.) The ALJ thus concluded that with
treatment, plaintiff's condition did not significantly limit her
ability to perform basic work activities for a period of twelve
continuous months commencing prior to March 31, 1993.

The ALJ further engaged in the additional sequential
analysis required in determining the severity of a mental
impairment, 20 C.F.R. § 404.1520a(d),[7] and determined that, prior
to April 1, 1993, the evidence failed to show that plaintiff's
treated mental impairment resulted in more than a mild restriction
in plaintiff's activities of daily living and mild difficulties in
social functioning and in concentration, persistence and pace. The

_____

[7]          When we rate the degree of limitation in
        the first three functional areas (activities
        of daily living; social functioning; and
        concentration, persistence, or pace), we will
        use the following five-point scale: None,
        mild, moderate, marked, and extreme. When we
        rate the degree of limitation in the fourth
        functional area (episodes of decompensation),
        we will use the following four-point scale:
        None, one or two, three, four or more. . . .

        . . .

            If we rate the degree of your limitation
        in the first three functional areas as "none"
        or "mild" and "none" in the fourth area, we
        will generally conclude that your
        impairment(s) is not severe . . . .

20 C.F.R. § 404.1520a(c)(4)-(d)(1).

ALJ also found plaintiff not to have experienced any episodes of decompensation each of extended duration.  (Tr. 17.)

Under Step Two of the Commissioner's five-step evaluation process, a claimant has the burden of establishing that her impairment(s) significantly limit her ability to perform basic work activities, that is, more than minimally impact her ability to work.  Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001); Nguyen, 75 F.3d at 430-31.  Substantial evidence on the record as a whole supports the ALJ's finding that the plaintiff failed to meet her burden here.  At the time her insured status expired, plaintiff's mental condition was controlled with medication as evidenced by Dr. Bronson's April 1993 statement that he had been treating plaintiff since 1990 and that Prozac was effective in treating her condition.  Further, the record shows that once undergoing treatment, plaintiff did not experience any exacerbations of her condition prior to March 31, 1993, which resulted in significant limitations in her ability to perform basic work activities.  See Nguyen, 75 F.3d at 431 (claimant failed to demonstrate that impairment was more than slight where medical evidence showed impairment improved with medication); Richmond v. Callahan, 998 F. Supp. 1007, 1011 (W.D. Ark. 1997) (affirming Commissioner's decision to terminate analysis at Step Two where it was shown that medication controlled condition) (citing Williams v. Sullivan, 960 F.2d 86, 89 (8th Cir. 1992); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989)), aff'd sub nom. Richmond v. Apfel,

141 F.3d 1170 (8th Cir. 1998) (table).  Indeed, it is well settled that a medical condition which is shown to be controlled with medication and treatment cannot support a finding of total disability.  Middlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000).  Further, the record shows that during this relevant time, no physician placed any restrictions on plaintiff's activities. This is especially significant here inasmuch as the last documented treatment for plaintiff's mental condition prior to March 31, 1993, showed plaintiff to have related to her physician that she intended to look for employment and nothing shows the physician to have advised against such effort.  The lack of any medically necessary restrictions in the record supports the ALJ's finding that, at the time her insured status expired, plaintiff's impairment was not severe.  Id.

There simply is no evidence in the record which shows that commencing on or before March 31, 1993, plaintiff suffered an impairment for twelve continuous months which significantly limited her physical or mental ability to do basic work activities. Plaintiff has thus failed to demonstrate that during the relevant period, she suffered a severe impairment.  While the record shows plaintiff's mental impairment to have dramatically worsened beginning in June 1996, such deterioration occurred long after plaintiff's insured status expired.[8]

---

[8]Plaintiff argues that in making his adverse determination, the ALJ should have, but failed to consider the observations of

Substantial evidence on the record as a whole supports the ALJ's decision that plaintiff failed to meet her burden of showing that she became disabled prior to the expiration of her disability insured status, and that such disability existed continuously to at least within twelve months of the date she applied for disability benefits. Accordingly, the decision of the Commissioner in denying plaintiff's claim for Disability Insurance Benefits on her February 12, 2002, application must be affirmed.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed and plaintiff's Complaint is hereby dismissed with prejudice.

Judgment shall be entered accordingly.

_____
UNITED STATES MAGISTRATE JUDGE

Dated this _1st_ day of March, 2006.

---

plaintiff's co-workers from Sam's Club. (<u>See</u> Tr. 78-86.) The undersigned notes, however, that plaintiff worked at Sam's Club from May 2002 through December 2003. Inasmuch as these third-party statements reflect observations made over nine years after plaintiff's insured status expired, the ALJ did not err in failing to consider them in his determination.